**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS – PEORIA DIVISION**

| | | |
|---|---|---|
| KARI DONOHO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | Case No. _____ |
| | ) | |
| HEARTLAND COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT
FOR DECLARATORY RELIEF AND DAMAGES**

COME NOW Plaintiff, KARI DONOHO, by and through her attorney, Bethany D. Hager, pursuant to Fed. Rule Civ. Proc. 81(c)(1) and Fed. Rule Civ. Proc. 15(a)(1), (2), and for her Complaint for Declaratory Relief, and Damages against Defendant, HEARTLAND COMMUNITY COLLEGE, alleges as follows:

**PARTIES**

1.      Plaintiff is an adult individual who was employed by the Defendant as an instructor.

2.      Defendant is an institution of higher education located and operating in Normal, McLean County, Illinois.

3.      Plaintiff has sustained substantial change to the terms of her employment, including discipline, hostile work environment, prolonged unpaid suspension and termination, solely due to not agreeing to be vaccinated for COVID-19 or submitting to COVID-19 testing.

**FACTUAL BASIS**

4.      On or about September 3, 2021, Defendant Pritzker issued an Executive Order stating that individuals employed in state-owned and/or operated congregate care facilities would be required to receive the first shot of a two-shot vaccine for Covid-19, or one shot of a one-shot

1

vaccine for Covid-19, by September 27, 2021, or be excluded from their places of employment. (See Exhibit A)

5.      On or about September 17, 2021, Defendant IDOC and IDHS issued "emergency rules," modifying the definition of "quarantine" in the Illinois Administrative Code so as to render the governor's Executive Order legally effective.

6.      The emergency rules were later found to be null and void. *See*, *Austin v. Pritzker*, Sangamon County 21-CH-500006, February 4, 2022 Decision and Order of Judge Grischow, *affirmed*, Fourth District Appellate Court No. 4-22- (February 17, 2022), *lv to appeal denied*, Illinois Supreme Court No. 128205. (See, collectively, Exhibit C)

7.      On or about September 16, 2021, Defendant notified Plaintiff that Defendant was implementing a mandatory Covid-19 vaccination policy (the "Policy") by which employees would be required to receive the first shot of a two-shot vaccine or one shot of a one-shot vaccine by October 14, 2021. (See Exhibit B)

8.      The Policy stated that affected employees who refuse to receive a Covid-19 vaccination and fail to submit proof of vaccination, or who fail to submit a completed exemption form by the timeframes outlined in the Policy, shall be subject to progressive discipline up to and including suspension and discharge. (See Exhibit B)

9.      Employees who refused to receive a Covid-19 vaccination for any reason, began facing progressive discipline beginning as early as November 9, 2021.

10.     Plaintiff sought exemption from the Policy due to her sincerely held religious belief.

11.     The ILL Admin Code Title 56 300.860 Medical Examinations and Records, and 820 ILCS 235/ Medical Examination of Employees Act all state that "no employer shall require any employee or applicant for employment to pay the cost of a medical examination or the cost of

furnishing any records of such examination required by the employer as a condition of employment."

12.     Plaintiff was subjected to discipline proceedings, was subjected to suspension without pay, and was ultimately terminated solely because, due to her sincere religious convictions, she did not submit to Covid-19 vaccination and testing.

13.     Regular Covid testing was not required of employees who received the Covid-19 vaccine.

14.     Employees who did not have an approved exemption were not subjected to the same testing requirements as those whose exemptions were approved.

15.     Plaintiffs, and other employees of the Defendant, were not required to vaccinate for any other infectious disease as a condition of their employment.

16.     The only disease for which Plaintiff, and other employees of the Defendant, are required to test as a condition of their employment is tuberculosis. See, 77 Ill. Admin. Code 696.130.

17.     Plaintiff objects to being vaccinated or tested for Covid-19 for a variety of reasons based upon her faith as revealed through prayerful discernment.

18.     Plaintiff was willing to abide by protections that have been demonstrated to protect against Covid-19, namely, self-monitoring for symptoms, wearing a mask when appropriate, voluntary reporting of potential symptoms, and reasonable testing requirements. These mechanisms provide a sufficient alternative to forced vaccination in violation of sincerely held religious beliefs.

19.     Being vaccinated or asymptomatically tested for Covid-19 violates the moral conscience of Plaintiff because, *inter alia*, Plaintiff holds sincere beliefs that prevent her from

submitting to health care procedures which she, a competent adult, does not believe are medically necessary.

20.     Being vaccinated for Covid-19 violates the moral conscience of Plaintiff because, *inter alia*, Plaintiff holds sincere beliefs that prevent her from submitting to health care procedures or vaccines that she reasonably believes have a connection to the use of aborted fetal cell lines either in testing, development, or production.

21.     Requiring only unvaccinated persons to submit to testing for Covid-19 violates the moral conscience of Plaintiff because, *inter alia*, Plaintiff holds sincere beliefs that prevent her from submitting to or participating in workplace procedures which arbitrarily discriminate between employees on the basis of health care choices made pursuant to freedom of conscience.

22.     The vaccines available to Plaintiff at the time had only had emergency use authorization for one year.[1]

23.     The only then-available COVID-19 vaccine (Janssen/Johnson & Johnson), is authorized for Emergency Use under the Emergency Use Authorization statute. The Emergency Use Authorization statute mandates that all individuals to whom the product may be administered, including the Plaintiffs, be given the right to accept or refuse administration of the product.

24.     The recent FDA biologics license application (BLA) approval of the product COMIRNATY, COVID-19 Vaccine, mRNA, manufactured by BioNTech Manufacturing GmbH,[2] does not change the EUA status of the Pfizer-BioNTech COVID-19 Vaccine that has been available under EUA since December 23, 2020.[3] According to the EUA extension letter issued by

---

[1] https://www.dph.illinois.gov/covid19/vaccination-plan
[2] BLA Approval Letter for COMIRNATY, COVID-19 Vaccine, mRNA (Aug. 23, 2021), https://www.fda.gov/media/151710/download.
[3] EUA Extension Letter for Pfizer-BioNTech COVID-19 Vaccine (Aug. 23, 2021), https://www.fda.gov/media/150386/download.

the FDA to Pfizer on August 23, 2021, the Pfizer-BioNTech COVID-19 Vaccine and BioNTech's

COMIRNATY, COVID-19 Vaccine, mRNA "are legally distinct" products.[4]

25.     Moreover, the now "approved" COMIRNATY vaccine cannot be distributed for

use until BioNTech submits "final container samples of the product in final containers together

with protocols showing results of all applicable tests" and BioNTech receives "a notification of

release from the Director, Center for Biologics Evaluation and Research (CBER)."[5] Thus, it is not

clear when (or if) any Illinois State employee will have access to the "approved" COMIRNATY

vaccine, leaving all employees who may elect to receive the "Pfizer" vaccine pursuant to the

mandatory vaccine policy to receive a dose of the current stock of Pfizer-BioNTech vaccine still

being administered subject to EUA rules.

26.     On August 23, 2021, the United States Food and Drug Administration issued two

separate letters pertaining to two separate COVID-19 vaccines. (See, Exhibit J, BioNTech Letter,

United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021);

Exhibit K Pfizer Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23,

2021).)

27.     In the Pfizer Letter, the FDA confirms that, on December 11, 2020, it granted

Emergency Use Authorization for the previous Pfizer-BioNTech COVID-19 Vaccine. (Ex. K,

Pfizer Letter at 1.) It also notes that the EUA approval was continued on December 23, 2020,

February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2.)

28.     The Pfizer Letter also makes clear that there is a scientific, manufacturing, and

legally significant difference between the Pfizer-BioNTech COVID-19 Vaccine and the newly

---

[4] *Id*. at 3 n.10 (emphasis added).
[5] BLA Approval Letter for COMIRNATY, COVID-19 Vaccine, mRNA, supra note 2 at 2.

approved Comirnaty Vaccine. (Pfizer Letter at 2 n.9.)

29.     Specifically, the FDA stated that although the COMIRNATY COVID-19 Vaccine was granted full approval by the FDA, the Pfizer-BioNTech COVID-19 Vaccine was still only subject to the EUA authorization. (Pfizer Letter at 2 n.9 ("In the August 23, 2021 revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY (COVID19 Vaccine, mRNA) for the prevention of COVID-19 for individuals 16 years of age and older, this EUA would remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses. It also authorized COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved biologics license application (BLA)."

30.     Put simply, because all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization statute, the Emergency Use Authorization statute prohibits Defendants (or any other entity) from making the COVID-19 vaccines mandatory.

31.     All existing vials of the EUA-approved Pfizer-BioNTech COVID-19 vaccine remain under the sole authorization of the EUA. (Pfizer Letter at 2 n.9.)

32.     On information and belief, the existing vials of the EUA-approved Pfizer-BioNTech COVID-19 vaccine register in the millions, and anyone receiving any COVID-19 vaccine for the foreseeable future is guaranteed to receive the EUA-approved Pfizer-BioNTech COVID-19 Vaccine, not the fully approved COMIRNATY.

33.     There are no currently existing doses of COMIRNATY in the United States and it is not being manufactured for production or distribution in the United States at this time.

34.     In fact, the FDA Pfizer Letter plainly indicates that COMIRNATY is not available in the United States: "Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to

prevent COVID-19 in individuals 16 years of age and older, there is no sufficient approved vaccine for distribution to the population." (Pfizer Letter at 6 n.12 (emphasis added).)

35.    Thus, the only currently available COVID-19 vaccines are subject solely to EUA approval.

36.    The Emergency Use Authorization Fact Sheets for all three COVID- 19 vaccines state that it is the individual's right to refuse administration of the vaccine.

37.    Pfizer has acknowledged over 1200 serious to life-threatening known side effects from its "investigational Covid-19 vaccine."[6]

38.    According to the CDC, the survival rate of all persons who have contracted Covid-19 nation-wide, based on reported numbers, is 98.40%.[7]

39.    The COVID-19 vaccine has resulted in a statistically significant number of serious adverse reactions, including myocarditis, a potentially fatal inflammation of the heart muscles, and pericarditis, a potentially fatal inflammation of the heart tissue. (*See*, Patricia Kime, Dod Confirms: Rare Heat Inflammation Cases Linked to COVID-19 Vaccines, Military.com (June 30, 2021).[8]

40.    According to the CDC, the survival rate of all persons who have contracted Covid-19 nation-wide, when adjusted for unreported cases, is 99.36%.[9]

41.    According to the IDPH, the survival rate of all persons who have contracted Covid-19 in Illinois, based on reported numbers, is 98.46%.[10]

42.    According to the IDPH, the survival rate of all persons who have contracted Covid-

---

[6] https://phmpt.org/wp-content/uploads/2021/11/5.3.6-postmarketing-experience.pdf

[7] https://covid.cdc.gov/covid-data-tracker/#datatracker-home

[8] https://www.military.com/daily-news/2021/06/30/dod-confirms-rare-heart-inflammation-cases-linked-covid-19-vaccines.html

[9] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/burden.html (this CDC report adjusts the reporting based on asymptomatic cases which never get reported to government agencies.)

[10] https://www.dph.illinois.gov/covid19/covid19-statistics

19 in Illinois, when adjusted for all unreported Covid cases, is 99.52%.[11]

43.     The suspension without pay, termination, discriminatory treatment, and subjection to a hostile work environment toward Plaintiff has caused incalculable and irreparable harm to Plaintiff and her family, namely, jeopardizing Plaintiff's ability to provide for her family and requiring substantial changes to Plaintiff's daily life in order to avoid homelessness, lack of medical care, lack of food and shelter, disrupted education for children, financial hardship or ruin, and harms to physical, mental and emotional health.

44.     The Illinois Legislature in carrying out its constitutional duty passed the Department of Public Health Act vesting the IDPH with "supreme authority" in relation to areas of testing, vaccinations, and quarantine.  A copy of the Department of Public Health Act ("PHA") and Illinois Administrative Code is attached hereto as Exhibit N.

45.     Section 690 of Title 77 of the Illinois Administrative Code has been in existence since 1970 and all State actors and citizens have operated under those set standards despite contagious diseases such as MERS, Swine Flu, and Ebola.

46.     Pursuant to said statute and administrative code, the IDPH has explicitly delegated its authority to order testing and/or vaccinations to certified local health departments.  Neither the PHA nor the Illinois Administrative Code permit the Governor or any other State agency to implement broad public health measures through implementation of Executive Orders that impede on the explicit due process rights set forth in the PHA.

47.     In the passing of the PHA, the Illinois Legislature made clear the IDPH's promulgated administrative rules regarding procedural safeguards must be followed when

---

[11] https://www.dph.illinois.gov/covid19/covid19-statistics

mandating citizens of the State of Illinois vaccinate and/or test to control the spread of contagious disease.

48.     The Governor now attempts to indicate he has the ability to make all decisions regarding an emergency by simply rendering Illinois in a "state of emergency" under the Illinois Emergency Management Agency Act ("IEMAA").  In making such an overreaching proclamation, the Governor fails to recognize and acknowledge the Legislature granted the IDPH the "supreme authority" in matters of testing, vaccinations, and quarantine.  Moreover, subsection (f) of the IEMAA includes mandatory language of "shall", thus requiring the Governor to coordinate with the IDPH with respect to responding to public health emergencies.  A copy of the IEMAA is attached hereto as Exhibit O.

49.     Never in the history of Illinois has the Governor, or other administrative agency, attempted to adopt such an abrasive public health regulation addressing a threat that is frankly unrelated to the workplace.  As the Supreme Court indicated, "this lack of historical precedent, coupled with the breadth of authority the Secretary now claims, is a telling indication that the mandate extends beyond the agency's legitimate reach."  *National Federation of Independent Business, et al. v. Department of Labor, Occupational Safety and Health Administration, Et Al.,* 595 U.S. 1, 7 (2022); citing *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010).

50.     The United States Supreme Court, moreover, has recognized that the issue of requiring vaccination and/or testing for any particular infectious disease is a matter of public health, not of workplace safety. *National Federation of Independent Business, et al. v. Department of Labor, Occupational Safety and Health Administration, Et Al.,* 595 U.S. 1, 7 (2022).

51.     Plaintiff seeks damages under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e,

and the Illinois Healthcare Right of Conscience Act, 745 ILCS 701 et seq. (as it existed at all times relevant to this claim).

52.     Plaintiff seeks declaratory relief under 28 U.S.C. §§2201-02, the Illinois Healthcare Right of Conscience Act, 745 ILCS 701 et seq., and the Declaratory Judgment Act, 735 ILCS 5/2-701.

53.     Plaintiff seeks attorney's fees and costs under 42 U.S.C. § 1988, and the Illinois Healthcare Right of Conscience Act, 745 ILCS 70/1 et seq.

## JURISDICTION AND VENUE

54.     This action arises under the laws of the United States, specifically 21 U.S.C. §360bbb-3 and 42 U.S.C. § 2000e, *et seq*.

55.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, and 1367.

56.     This Court has jurisdiction over this action because Plaintiff is seeking protection of her individual due process, religious freedom and other fundamental rights. *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728 (1981).

57.     The Plaintiff has filed claims with the Equal Employment Opportunity Commission and received her Right to Sue letter within the past 90 days.

58.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

59.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-02, implemented through Rule 57 of the Federal Rules of Civil

Procedure.

60.     This Court is authorized to grant the Plaintiff's prayer for relief regarding

damages, costs, and attorney's fees, pursuant to Rule 54 of the Federal Rules of Civil Procedure

and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981a and §2000e, *et seq*., and the Illinois

Healthcare Right of Conscience Act, 745 ILCS 70/1 et seq.

## RELEVANT LEGAL AUTHORITY

61.     The State has "important and legitimate interests in . . . protecting the health of

the pregnant woman and in protecting the potentiality of human life." *June Medical Services*

*L.L.C. v. Russo*, 591 U.S. ___ (2020) (Roberts, J., concurring) (citing *Planned Parenthood of*

*Southeastern Pa.* v. *Casey*, 505 U.S. 833, 875-876 (1992) (plurality opinion)

62.     The State has an interest in protecting the life of the unborn. *Casey*, 505 U.S. at

873.

63.     As a matter of public policy, "No right is held more sacred, or is more carefully

guarded by the common law, than the right of every individual to the possession and control of his

own person, free from all restraint or interference of others, unless by clear and unquestionable

authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

64.     As a matter of public policy, the right to bodily self-determination is recognized as

constitutionally protected by the right to privacy. See, *Eisenstat v. Baird*, 405 U.S. 438, 453 (1972).

See also, *Olmstead v. U.S.*, 277 US 438, 478 (1928) (Brandeis, J., dissenting) (the right to have

one's private life protected from government interference is described as "the right to be let alone-

the most comprehensive of rights and the right most valued by civilized man.")

65.     "It shall be an unlawful employment practice for an employer - (1) to fail or refuse

to hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a).

66.      "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate." 42 U.S.C. §2000e-5(g).

67.      "[S]ubject to the provisions of this section, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as an "emergency use." 21 U.S.C. §360bbb-3(a)(1) (the "Emergency Use Authorization Statute," or "EUA Statute.")

68.      As part of the explicit statutory conditions for an Emergency Use Authorization under the Emergency Use Authorization statute, the statute mandates that all individuals to whom the product approved for Emergency Use may be administered, be given the option to accept or refuse administration of the product. Specifically:

69.      "With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall for a

person who carries out an activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following . . . Appropriate conditions designed to ensure that individuals to whom the product is administered are informed — (I) that the Secretary has authorized the emergency us of the product; (II) of the significant known potential benefits and risks of such use, and of the extent to which such benefits are unknown; and (III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.  21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III).

70.     The primary policy furthered by the Illinois Healthcare Right of Conscience Act, amended by Public Act 102-667, is "to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care …" 745 ILCS 70/2.

71.     Under the HRCA's underlying definition, "health care" is defined as "any phase of patient care, including but not limited to, testing, diagnosis, prognosis, ancillary research, instructions, family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures, medication, or surgery or other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, intended for the physical, emotional and mental wellbeing of persons." 745 ILCS 70/3.

72.     "Conscience" is defined in the HRCA as "a sincerely held set of moral convictions arising from belief in and relation to God, or which, though not so derived, arises from a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." *Id.*

73.     The HRCA as it existed at all times relevant to this claim is unambiguous, and unequivocally applies to protect individuals such as the Plaintiff from unlawful vaccination or testing mandates, or any forced participation in medical procedures which violate her sincerely held religious beliefs. 745 ILCS 70/5, in particular, provides,

> Sec. 5. Discrimination. It shall be unlawful for **any** person, public or private institution, or public official to discriminate against **any** person in **any** manner, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or **any** other privileges, because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in **any** way in **any** particular form of health care services contrary to his or her conscience.

745 ILCS 70/5 (Source: P.A. 90-246, eff. 1-1-98.) (Emphasis added.)

74.     When Public Act 102-667 was enacted on or about November 8, 2021, it added a new Section 13.5 to the HRCA. The new Section 13.5 provides,

> It is not a violation of this Act for any person or public official, or for any public or private association, agency, corporation, entity, institution, or employer, to take any measures or impose any requirements, including, but not limited to, any measures or requirements that involve provision of services by a physician or health care personnel, intended to prevent contraction or transmission of COVID-19 or any pathogens that result in COVID-19 or any of its subsequent iterations. It is not a violation of this Act to enforce such measures or requirements. This Section is a declaration of existing law and shall not be construed as a new enactment. Accordingly, this Section shall apply to all actions commenced or pending on or after the effective date of this amendatory Act of the 102nd General Assembly. Nothing in this Section is intended to affect any right or remedy under federal law. (Source: P.A. 102-667, eff. 6-1-22.)

75.     The Amendment purports to "declare" that the law means and always meant to exclude Covid-19 from its protection of individual rights. 745 ILCS 70/13.5.

76.     The assertion is that lawmakers in the 1970s and 1990s somehow wrote HRCA fully intending to exempt Covid-19, a virus which was then unheard-of, from its provisions. It

also begs the question why, if lawmakers in the 1970s and 1990s were prescient enough to exempt Covid-19 from the requirements of HRCA, they did not see fit to exclude ebola, H1N1, measles, smallpox, or even influenza (for which a separate vaccine statute does actually exist – and which recognizes the exemption for religious objection within its provisions, see 210 ILCS 85/6).

77.    The Amendment contradicts the stated public policy of the HRCA which is to honor the sincerely held religious beliefs of every Illinois citizen. 745 ILCS 70/2. It conditions the conscience protection for Plaintiff's sincerely held religious conviction, found elsewhere in §§ 4, 5, 7, 8, 9, 10, and 11 of the HRCA, upon their compliance with any and all "measures and requirements" an employer might see fit to impose in the alleged attempt to combat, specifically, Covid-19 or any of its "subsequent iterations." PA 102-667, Section 5.

78.    Plaintiff has suffered the loss of her constitutionally and statutorily guaranteed rights of free exercise of religion and equal protection, because of the Defendants' actions.

79.    Additionally, Plaintiff has suffered a chilling effect on the exercise of her rights as a result of the Defendants' actions.

80.    The enforcement of Defendants' Covid-19 vaccination or testing program, are actions taken under color of state law.

81.    Defendant's actions have imposed irreparable harm to the Plaintiff's free exercise of religion.

82.    The Illinois Department of Public Health Act sets forth explicit due process procedures that State actors must follow when attempting to institute mandated vaccinations and/or testing.

83.    Pursuant to the Act, any person subject to testing under paragraph 2(d) shall be provided written notice from the IDPH that includes the following information:

     i.   that the individual <u>may refuse to consent</u> to physical examination, test, or collection of laboratory specimens; (ii) that if the individual consents to testing, the results of that testing specimens may subject the individual to isolation or quarantine pursuant to the provisions of subsection (c) of this Section; (iii) that if the individual refuses to consent to physical examination, tests, or collection of laboratory specimens and that refusal results in uncertainty regarding whether he or she has been exposed to or is infected with a dangerously contagious or infectious disease or otherwise poses a danger to the public's health, the individual may be subject to isolation or quarantine <u>pursuant to the provisions of subsection (c)</u> of this Section; and (iv) that if the individual refuses to consent to physical examinations, tests, or collection of laboratory specimens and becomes subject to isolation and quarantine as provided in this subsection (d), he or she shall have the right to counsel pursuant to the provisions of subsection (c) of this Section.

84.    Pursuant to the Act, any person that is subject to vaccination shall be provided written notice from the IDPH that includes the following:

     i.   that the individual may refuse to consent to vaccines, medications, or other treatments; (ii) that if the individual refuses to receive vaccines, medications, or other treatments, the individual may be subject to isolation or quarantine pursuant to the provisions of subsection (c) of this Section; and (iii) that if the individual refuses to receive vaccines, medications, or other treatments and becomes subject to isolation or quarantine as provided in this subsection (e), he or she shall have the <u>right to counsel pursuant</u> to the provisions of subsection (c) of this Section.

85.    That Department of Public Health Act further admonishes that the religious beliefs of individuals must be honored at all times in the administration of vaccinations.

86.    Governor Pritzker's authority relative to emergency authority is clearly spelled out in the provisions of the IEMAA.  The Executive Orders issued by Governor Pritzker lack any historical precedent despite numerous other pandemics that have faced this State since the implementation of the IDPHA.  The Executive Orders violate the mandated due process procedures set forth in the IDPHA that are afforded all citizens of the State of Illinois.

87.    Further, pursuant to the provisions of the IEMAA, Governor Pritzker is not provided independent authority to make decisions relative to public health related matters without

coordination from the IDPH.

88.     It is telling that when the Illinois Legislature passed the Department of Public Health Act pursuant to its constitutional authority, they did not even grant the DPH with authority to mandate vaccinations on the general public without consent, but merely gave them authority to quarantine individuals that would not consent if appropriate promulgated procedures sets forth in subsection (c) could be satisfied.

89.     Such consent was clearly important in the passing of such legislation with the understanding a vaccination is not something that can be undone at the end of the day.

## COUNT I
## DEFENDANT'S COVID-19 VACCINATION OR TESTING PROGRAM
## VIOLATES TITLE VII, 42 U.S.C. § 2000e, et seq.

90.     Plaintiff restates and incorporates by reference the allegations of paragraphs 1-89 as if fully set forth herein.

91.     The Plaintiff has a right to insist she not be compelled to be vaccinated or to submit to testing for Covid-19 unless the same be authorized by law.

92.     Defendant relied upon an executive order of the Governor as authority which compels them to require the Plaintiff, and other employees of Defendant, to be vaccinated or subject themselves to invasive testing for Covid-19.

93.     Title VII of the Civil Rights Act of 1964 prohibits Defendants from discriminating against the Plaintiff on the basis of her sincerely held religious beliefs.

94.     The Plaintiff has sincerely held religious beliefs that preclude her from receiving a Covid-19 vaccine.

95.     Plaintiff informed Defendants of those beliefs and requested a religious exemption and reasonable accommodations for the vaccine mandate.

96.     Nonetheless, the Defendants have, under color of law, adopted policies which mandate the Plaintiff to become vaccinated or submit to invasive testing.

97.     Defendants failed to provide the Plaintiff with religious exemptions and reasonable accommodations, thereby discriminating against the Plaintiff because of her religious beliefs.

98.     Defendants' failure to provide religious exemptions and accommodations has harmed and will continue to harm the Plaintiff.

99.     Plaintiff filed charges with the EEOC complaining of these discriminatory actions and have received her Right to Sue letters within the past 90 days.

100.    An actual controversy exists between the parties in regard to the lawful authority of the Defendants to compel the Plaintiff to submit to vaccination or testing for the COVID-19 to allegedly prevent the spread of an infectious disease.

101.    An immediate and definitive determination is necessary to clarify the rights and interests of all parties affected.

Wherefore, Plaintiff, KARI DONOHO respectfully prays for relief against Defendants as set forth in her Prayer for Relief.

## COUNT II
## DEFENDANT'S COVID-19 VACCINATION OR TESTING PROGRAM VIOLATED ILLINOIS HEALTHCARE RIGHT OF CONSCIENCE ACT, 745 ILCS 70/1 ET SEQ.

1.     Plaintiff restates and incorporates by reference Paragraphs 1 through 89 as though fully set forth herein.

2.     Plaintiff has a right to insist she not be compelled to be vaccinated or to submit to testing for Covid-19 unless the same be authorized by law.

3.     Defendant relied upon an executive order of the Governor as authority which compelled them to require Plaintiff to be vaccinated or subject herself to invasive testing for Covid-19.

4.     The Illinois Healthcare Right of Conscience Act as it existed at the time of all relevant events herein, prohibited Defendant from discriminating against Plaintiff on the basis of her sincerely held religious beliefs.

5.     Plaintiff holds sincere religious beliefs that preclude her from receiving a Covid-19 vaccine.

6.     Plaintiff informed Defendant of those beliefs and requested religious exemptions and reasonable accommodations from the vaccine mandate.

7.     Defendant acknowledged Plaintiff's right to have her sincerely held religious beliefs protected.

8.     Nonetheless, the Defendant then, under color of law, adopted policies which mandated Plaintiff to become vaccinated or submit to invasive testing.

9.     Defendant, then, failed to provide Plaintiff with religious exemption and reasonable accommodations, thereby discriminating against Plaintiff because of her religious beliefs.

10.     Defendant's failure to provide religious exemptions and accommodations has harmed and will continue to harm Plaintiff.

11.     An actual controversy exists between the parties in regard to the lawful authority of the Defendant to compel the Plaintiff to submit to vaccination or testing for the COVID-19 to allegedly prevent the spread of an infectious disease.

12.     An immediate and definitive determination is necessary to clarify the rights and interests of all parties affected.

Wherefore, Plaintiff, KARI DONOHO, respectfully prays for relief against Defendant as set forth in her Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for relief as follows:

A.    That this Court render a Declaratory Judgment declaring that Defendant's Mandatory COVID-19 Vaccination Policy, both on its face and as applied by Defendant, was illegal and unlawful under the Emergency Use Authorization statute, 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III) and Title VII, 42 U.S.C. § 2000e, et seq. and further declaring that:

a.  by terminating Plaintiff from employment with Defendant, Defendant has unlawfully denied Plaintiff her statutory rights under the Emergency Use Authorization statute to refuse administration of a product granted only Emergency Use Authorization; and

b.  by terminating Plaintiff from employment with Defendant, Defendant has unlawfully discriminated against Plaintiff on account of her sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of Title VII.

B.  That the Court render a Declaratory Judgment, adjudging and declaring that Governor Pritzker's Executive Orders, and Defendant's mandatory Covid-19 vaccination or testing policy, violate the Illinois Department of Public Health Act, and the Illinois Healthcare Right of Conscience Act, and further declaring that:

    a.  By terminating Plaintiff from employment with Defendant, Defendant has unlawfully denied Plaintiff her statutory rights under the Illinois Department of Public Health Act to refuse administration of a vaccine and medical testing; and

    b.  By terminating Plaintiff from employment with Defendant, Defendant has unlawfully discriminated against Plaintiff on account of her sincerely held religious objections to receiving or accepting one of the three COVID-19 vaccines in violation of the HRCRA.

C.    That this Court award Plaintiff actual damages in an amount to be proven at trial (but not less than $300,000, as provided by 42 U.S.C. §1981a(a) and (b), or $2,500 per violation, as provided by 745 ILCS 70/12), including those for pain and suffering, that Plaintiff sustained as a result of Defendant's discriminatory, unconscionable, and unlawful Mandatory COVID-19 Vaccination Policy.

D.    That this Court adjudge, decree, and declare the right and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

E.    That this Court retain jurisdiction over the matter for purposes of enforcing the Court's order.

F.    That this Court award Plaintiff the reasonable costs and expenses of this action, including reasonable attorneys' fees, as required by Title VII of the Civil Rights Act, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.

G.    That this Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully submitted,

By:      /s/ Bethany D. Hager
         Bethany D. Hager
         IL Bar Reg. No. 6301697
         Law Office of Bethany D. Hager
         917 North Walnut Street
         Danville, IL 61832
         Telephone: 217-497-1009
         bhagerlaw@gmail.com